CITY OF ST. LOUIS v. THEODORE KOCH ET AL., HEDGLEIGH REALTY COMPANY, Appellant.—74 S. W. (2d) 622.

Division One, September 18, 1934.*

*NOTE: Opinion filed at May Term, 1934, June 12, 1934; motion for rehearing filed; motion overruled at September Term, September 18, 1934.

*Gustave A. Stamm* and *Maurice L. Stewart* for Hedgleigh Realty Company.

*Charles M. Hay, John T. Hicks* and *James B. Steiner* for City of St. Louis; *J. M. Lashly* and *M. P. Phillips* for Julia Investment Company.

GANTT, J.—Proceeding in condemnation. From the judgment awarding certain lot owners $10,910 damages for a strip of land, the Hedgleigh Realty Company, who claimed to be the owner of said land, appealed.

On April 22, 1920, the board of aldermen of the city of St. Louis enacted an ordinance (No. 30,828) providing for the establishment of a highway one hundred feet wide from North Florissant Avenue westwardly along Palm Street and Natural Bridge Avenue to the western limits of said city.

On November 20, 1920, the city, pursuant to said ordinance, instituted a suit in the circuit court against several hundred defendants to condemn land along the south side of Palm Street and Natural Bridge Avenue.

At said time the Hydraulic Press Brick Company owned the land bounded by Kingshighway on the east, Union Boulevard on the west and Natural Bridge Avenue (then sixty feet wide) on the north. The suit contemplated taking a strip of said land along the south line of Natural Bridge Avenue forty feet in width at Kingshighway and narrowing in width westward to a point five and one-half feet at Union Boulevard. On April 10, 1924, and pending the proceeding in court, the Hedgleigh Realty Company (herein designated the company) purchased from the Hydraulic Press Brick Company fourteen hundred four and one-half feet of said land, bounded on the west by Union Boulevard, on the north by Natural Bridge Avenue (then sixty feet wide), and on the east by the east line of Norwood Avenue, if extended north to the south line of Natural Bridge Avenue (then sixty feet wide).

The company immediately subdivided said land into blocks and lots, naming the subdivision Hedgleigh Park. It did so to sell the lots and realize a profit. The plat of said subdivision was in statutory form. It was approved by the city board having charge of the streets, and recorded on June 6, 1924.

It shows the following: The lots faced north and south with an alley running east and west through each block. The northern tier of the lots in blocks one and eight abutted the strip of land (herein designated the strip) necessary for street purposes, if Natural Bridge Avenue was widened from sixty to one hundred feet. The strip was not divided into blocks and lots. The balance of the land purchased by the company from the Hydraulic Press Brick Company was so divided, which blocks and lots were numbered, as required

by Section 11180, Revised Statutes 1929, and the streets named. The streets and alleys running through said balance of the land were "crosshatched" on the plat. The streets running north and south were not outlined as extending through the strip necessary for street purposes, if Natural Bridge Avenue was widened from sixty to one hundred feet. The strip was not "crosshatched" on the plat. However, on the strip as shown on the plat was written the following: "Reserved subject to condemnation by Ordinance No. 30,828." And the acknowledgment of the company to the plat did not mention the strip as dedicated to public use.

The company contends that the word "reserve" as used means "to except, to keep, to hold," and contends that the words "reserved subject to condemnation by Ordinance No. 30,828" written on the plat operated to except from the grant, made by the plat, said strip of land.

A statutory dedication operates by way of a grant. It follows that in construing the plat we should give effect to the intention of the company as manifested by its acts as shown by the plat. In other words, we are not limited to the words written and markings made on the plat. We must give effect to the meaning and intent exhibited by the outlines of the plat.

Having in mind this cardinal rule of construction, we find that the strip was not intended for sale. It was not divided into blocks and lots and the lots for sale numbered as required by statute. We further find that if the strip was excepted from the grant, made by the plat, the owners of the northern tier of lots in blocks one and eight would have no access to said lots except through a rear alley. In other words, they would be without street access to their property. The company could not have so intended. Furthermore, the failure to run the north and south streets through the strip indicates that the company intended the strip to be a part of Natural Bridge Avenue. If so, it was not necessary to give the strip a street name on the plat.

We think said words written on the strip as shown on the plat were intended to direct attention to the location of the subdivision on a great highway, and that the word "reserved" as used was intended as descriptive of the widening of Natural Bridge Avenue, and as assurance that the strip had been dedicated for street purposes as appurtenant to and for the benefit of the owners of abutting lots and the public. Indeed, this is the only reasonable construction that can be given the plat. Furthermore, if the company desired to except the strip from the grant, it could have done so by omitting the strip from the subdivision. We hold that the company made a statutory dedication of the strip to public use for street purposes. We are strengthened in this view by the practical construction given

the plat by the company. Immediately after platting the subdivision, it paved the strip to within a few feet of the pavement on original Natural Bridge Avenue. It constructed curbs and laid a sidewalk on the strip. Thereupon the city installed electric lamp standards, street lights, water mains and fire plugs between said curbing and sidewalk. Thereafter the company, in selling the northern tier of lots, used a sales plat which described the subdivision as surrounded by four great thoroughfares, to-wit: Kingshighway, Union, Natural Bridge and St. Louis Avenues. The sales plat in no way indicated that the strip was not dedicated to public use. On the contrary, the price lists announced that the "prices include improvements, consisting of concrete streets and curbs, granitoid sidewalks, sewers, water and gas." Furthermore, its advertising matter, correspondence and contracts with reference to the sale of said lots and its contracts with reference to the construction of buildings thereon indicated that said blocks and lots fronted on Natural Bridge Avenue.

The company does not contend for a reservation out of land dedicated for street purposes. It claims absolute ownership of the strip. If it granted the strip for street purposes, there would be no damage to reserve. An attempt to thus reserve damage would be inconsistent with the grant and must fail. Furthermore, the mere payment by the company of taxes on the strip did not defeat the grant for street purposes. [Buschmann v. City of St. Louis, 121 Mo. 523, l. c. 537, 26 S. W. 687.]

It should be stated that the condemnation proceeding extended over a period of eleven years. On May 19, 1924, the court appointed commissioners to fix the damages for the land taken, assess special benefits, if any, against the lands benefited by the improvement, and assess against the city the balance of the damages, if any, above the amount of special benefits. In view of the company's claim of ownership, the city continued the condemnation proceeding against the strip.

On February 9, 1929, the commission filed its report. It found that the lots abutting the strip would be especially benefited in the sum of $19,000, and that the damage for taking the strip was $10,910. It then apportioned against the lots the difference between $19,000 and $10,910 as the balance due on the assessment of special benefits. In effect, it found that the company had no interest in the strip.

Exceptions to the report of the commission were filed by the company. At the April Term, 1929, and on May 17; 1929, its exceptions were heard by the court. At the June Term, 1929, and on September 9, 1929, the court sustained certain exceptions of the company wherein it claimed to be the owner of the strip. There was no exception taken to this ruling of the court. For this reason the com-

pany contends that said ruling became *res judicata* at the close of that term. We do not think so. The court at the same term and on September 16, 1929, made an order granting leave to certain owners of lots abutting the strip "to intervene and make claim to whatever award is made to the Hedgleigh Realty Company, one of the defendants herein." This order is inconsistent with a final determination of the question by the ruling on said exceptions. It is clear that said rulings left the question of ownership open for determination. [State ex rel. v. Klein, 140 Mo. 502, l. c. 510, 41 S. W. 895; State ex rel. v. Riley, 219 Mo. 667, l. c. 690, 118 S. W. 647.]

The company cites St. Louis v. Querl Lumber Co., 277 Mo. 167, 210 S. W. 21, as sustaining its contention. In that case the order was a final determination of the question of ownership.

The second commission, appointed to fix damages and assess special benefits in instances where exceptions to the report of the first commission were sustained, awarded no damage to the company for the strip. In effect, it followed the report of the first commission with reference to the strip. The company also filed exceptions to this report. The exceptions were overruled and judgment entered in accordance with the report of the second commission with reference to said strip.

Having dedicated the strip for street purposes, the company is in no position to challenge the award of damages to the abutting lot owners for taking the strip.

The judgment should be affirmed. It is so ordered. All concur.

